CONLEY *v.* SUPREME COURT, INDEPENDENT ORDER OF
FORESTERS.

1. INSURANCE — FRATERNAL BENEFICIARY SOCIETIES — USE OF
   DRUGS.
   In an action upon a policy of insurance, which forfeited the
   interest of the insured, under a by-law, for excessive use of
   intoxicants or narcotics, the evidence showing that deceased
   used morphine to excess, and had twice attempted to be
   cured of the habit, and no expert testifying that in his opin-
   ion the morphine used was not injurious to the deceased,
   it was error to refuse a peremptory instruction for the de-
   fendant.

2. SAME—SUSPENSION FROM SOCIETY.
   Failure of the representatives of deceased to prosecute his
   appeal from a suspension from the order precludes a recov-
   ery.

3. SAME—EXHAUSTION OF REMEDIES WITHIN SOCIETY.
   No action could be instituted until the remedies given within
   the order were exhausted, as provided by a by-law of the as-
   sociation.

Error to Lapeer; Smith, J.  Submitted June 8, 1909.
(Docket No. 8.)  Decided September 21, 1909.

Assumpsit by Mary Conley against the Supreme Court,
Independent Order of Foresters, on a policy of insurance.
A judgment for plaintiff is reviewed on writ of error.
Reversed.

*Geer, Williams & Halpin,* for appellant.

*William E. Brown,* for appellee.

HOOKER, J.  The plaintiff, a widow, recovered a judg-
ment against the defendant upon a certificate issued upon
the life of her husband, in which she was named as bene-
ficiary.  The defendant has appealed.  The deceased

joined the defendant order in 1897. The undisputed testimony shows that in 1900 or 1901 he began taking morphine, and as early as 1903 he had become addicted to its use, and that in that year he went to an institution for the cure of the habit, and after a stay of three months he returned much improved. The plaintiff so testified, and also stated that he did not use morphine for about a year after his return, during which period his health was much better, and that in 1906 he had again become addicted to the use of morphine, and went to an institution at Dearborn, at the suggestion of his brothers, and afterwards to the hospital at Detroit, because he wanted to be cured of it. There is much evidence justifying the conclusion that the morphine habit is deleterious to health generally, if, indeed, we may not take judicial notice of such fact.

The importance of this testimony arises from a provision (section 154) of defendant's by-laws, which provides that:

"Any member of the order who shall engage in or participate in any unlawful or foolhardy undertaking, or who shall use intoxicants or opiates or other narcotics to such excess as to endanger his health, or to materially affect the risk upon his life, or to directly or indirectly cause his death, * * * shall *ipso facto* forfeit all claims of whatever nature which he or his beneficiaries might otherwise have had upon the supreme court, and all such claims shall *ipso facto* lapse and become and be absolutely null and void, and he and his beneficiary or beneficiaries, or heir or heirs, or legal personal representative or representatives, shall not be entitled to receive and shall not be paid any benefit whatsoever by the supreme court."

To break the force of the testimony mentioned above, counsel for plaintiff offered testimony by the plaintiff tending to show that in 1900 or 1901 her husband injured his back, and that he afterwards suffered great pain, and that so far as she knew he always took morphine for the purpose of allaying such pain. Upon this, and professional evidence that morphine is a drug given to allay pain, and that when the patient is *in extremis* its use may prolong life, counsel claimed that it was competent

for the jury to find that the deceased had no morphine habit deleterious to health, or to materially affect the risk upon his life; and it is evident that the jury so determined.

The testimony also conclusively showed that a short time before the death of Dr. Conley, and late in August, 1906, the defendant first received information that he had become addicted to the use of morphine to an extent that it endangered his health and materially affected the risk upon his life, and after an investigation a citation was served upon him to show cause to the executive council of the order on October 6, 1906, why he should not be expelled from the order for using morphine. He paid no attention to the citation, and the executive council suspended Dr. Conley on October 6th. Notice to this effect was sent to the local court on October 10, 1906, and also to Dr. Conley, and on October 22d he signed a letter, written by this plaintiff, appealing from the decision to the supreme court of the order, and this was duly forwarded. Dr. Conley died on October 24, 1906. The appeal was not prosecuted by or on behalf of the beneficiary, as it might have been under the provisions of by-laws (No. 196):

"Sec. 196. (1) The right of appeal shall be vested in every member of the order, and in case of the death or disability of a member the right of appeal shall be vested in his beneficiary or legal personal representative or other person deriving legal rights from him or them or any of them."

Defendant contends that by reason of this decision of the executive council the deceased was not a member in good standing at the time of his death, and therefore no recovery could be had upon the certificate.

Plaintiff made several claims in answer to this:

(1) That it was an unreasonable by-law, which required the member to go to Toronto, Canada, to prosecute the appeal, and therefore that there was no obstacle to this suit.

(2) That the right of the defendant to assert plaintiff's habit and suspension as a defense was waived by accept-

ing dues for the month of October, after learning of such habit.

The testimony bearing on this subject is, in substance, that on September 30th, and before it was brought to defendant's attention that Dr. Conley had such habit, the local court collected $1.19, the dues for October.  Of this sum 94 cents was sent to the defendant as its share.  This reached defendant on October 23d, which was the first information received by it of such collection.  On October 30th it returned the fund to the local court, with directions to hand the money back to the persons who paid it, for the reason that Dr. Conley was not a member in good standing at the time it was paid.  As we understand it, the sum of 94 cents was tendered back twice by the local court.

Proofs of death were filed by the plaintiff.  The by-laws (section 162) provide that, "if the supreme chief ranger has doubt of the validity of the claim, he may reject it."  The by-laws (section 201) provide further that:

"SEC. 201. (1) No member of the order, nor his beneficiary, nor his legal personal representative, nor other person in any way interested in any of his benefits, nor any one deriving legal rights from him, or them, or any of them, shall be entitled to bring any civil action or other legal proceeding against the supreme court, or against any other court or branch of the supreme court, until he shall have exhausted all the remedies provided in the constitution and laws by appeals and otherwise; and any member of the order, or his beneficiary, or his legal representative, or other person in any way interested in any of his benefits or deriving legal rights from, through, by, or under him or them, or any of them, who shall bring any civil action or other legal proceeding against the supreme court, or against any court or any other branch of the supreme court, before he shall have exhausted all remedies within the order by appeals and otherwise, shall *ipso facto* forfeit all benefits and all rights, claims, and demands therein and thereto to which he or they or any of them might otherwise have been entitled, and if he be a member of the order he shall *ipso facto* stand suspended from the order.

"(2) Where the laws of the Province, State, or Country in which a member has a fixed place of abode, or, if deceased, had a fixed place of abode at the time of his death, legally give and recognize the right of the member or other person claiming legal rights under him to maintain an action after the decision of the executive council on appeal on matters relating to the monetary benefits of the order, the right is hereby expressly reserved to the member himself, or to his beneficiary or legal personal representative, or to other persons deriving legal rights from him or them, or any of them, to bring action thereon in any civil court of competent jurisdiction; provided that all the remedies in section 197 shall first be resorted to and exhausted by appeals and otherwise as a condition precedent to the right to bring any such action or maintain the same in a court of law or equity."

The points discussed are:

(1) That the undisputed testimony shows that deceased had used morphine to such excess as to endanger his health and materially affect the risk on his life, and the court should have directed a verdict for the defendant for that reason.

(2) That under the contract the occasion of deceased's use of morphine was immaterial, and it was error to submit the case to the jury upon the theory that, if taken to allay pain, it was not a violation of the contract.

(3) The court should have directed a verdict upon the ground that by reason of his suspension the deceased was not a member of the defendant order in good standing at the time of his death.

(4) That a verdict should have been directed in defendant's favor upon the ground that plaintiff did not appeal from the order of the chief ranger disallowing her claim.

(5) That the court erred in denying a motion for new trial.

The proof in this cause that the deceased was addicted to the use of morphine to an extent that was injurious to and endangered his health and was material to the risk is overwhelming. The learned circuit judge must have taken this view of it, for he stated that:

"I feel very free to say that, if I were to dispose of this

as a question of fact, I could not for a moment give this lady a judgment. From my mind the facts are almost overwhelming that he did have the habit of taking morphine, and that under the by-laws of this order and the provisions of the sections that have been read here his beneficiary could not recover; but there is some, and I am not so sure but there is enough, testimony here so that the plaintiff is entitled to argue the question, answers that the doctors gave here, that the danger from the pain was greater than that of the morphine, and he did not have the habit at all, but he was taking it for the pain. I could not believe that at all; but I think it can be argued to the jury. If he had the habit, whether it grew by administering morphine for the pain in the first place, or acquired the habit, the insurance is void, or was void when the question was raised by the order. I have more confidence in the jury than counsel for defendant has. If my record and reputation depended upon it, I think I would take this case from the jury. I think I should. * * *

"But for one proposition I should have disposed of this case myself. But it is not the province of the court to dispose of disputed questions of fact. Counsel for the claimant present one proposition to you as an excuse by Dr. Conley in the use of morphine, and I can state it no better than reiterate Senator Brown's version made in your hearing a moment ago. He used this expression: 'Not a drop, mind you, not a grain a day, of morphine was used by Dr. Conley, except to allay pain.' And if the jury find this to be so, then the plaintiff is entitled to a verdict. * * *

"The statement of the claimant is, and the theory presented for her by her counsel is, this: That Dr. Conley had his back injured several years before he died, I think by the lifting of a tub and slipping at the time, and that at some subsequent period, I think two or three years, perhaps I am wrong about the time, he sprained his back again, and that those sprains gave rise to severe—counsel say, excruciating—pain, and that this was continued, and that Dr. Conley, being a physician, took this morphine entirely to allay pain, and that he never did indulge in it as a habit at all; that he took no more morphine than was actually necessary to allay this excruciating pain, and he never continued it any longer than was necessary to allay the pain.

"Now, if it is established by a fair preponderance of the

evidence that those are the facts, then you may find a verdict in favor of the plaintiff.  *  *  *  I have given the law to be that unless Dr. Conley commenced taking this morphine for the purpose of allaying pain, that unless he had continued pain in the back which made it advisable to administer it, and that he took no more of it than was necessary to allay continued pain, so that you can fairly say that the injury from the pain would have been as great without the morphine as in the using of it to allay the pain, your verdict must be for the defendant.  But if you can fairly say that this is true from the record, then your verdict should be for the plaintiff in the sum of one thousand seventy-nine and $\frac{19}{100}$ dollars."

Again, if there is any testimony that tends to show that the morphine taken during this long period was in every instance taken to allay excruciating and continuous pain, resulting from an injury to deceased's back, and not only that, but that the morphine prolonged rather than shortened his life, and therefore was not injurious to the risk, it must be found in the testimony of the plaintiff, or the brother of deceased, and that of experts who testified that cases might arise where such would be true.  No one testified, however, that in his opinion this was true in this case, either from knowledge of conditions, or in answer to hypothetical questions fairly covering the conclusively shown conditions, and the proof most conclusively shows the contrary.

The wife's testimony shows that her husband went twice to be cured of the drug habit, after the alleged injury to his back, which she said had "so grown on him that in her opinion he could not control himself in its use." While she said that he was a very sick man with his back, she also said that, when he said he was going to Eloise to get well, she supposed he meant "well of the morphine habit," and "the only way he could get well of that was to go somewhere for treatment."  Moreover, on his return he was better as to the habit, and his general health was "very much improved," and for a time, perhaps a year, he refrained from taking morphine; but in 1906, he had

occasion to go again, at the suggestion of his brothers. She said:

" He went to the Retreat because his brothers thought he would have good care there. He had become addicted to the use of morphine again, and went there for treatment, because he wanted to be cured of it. I can't tell exactly how long he had been taking morphine after he came from Eloise before he went to Dearborn, and don't know how long he was in that Retreat at Dearborn. He went back to Eloise from the Retreat at Dearborn, and I suppose that was still a hospital for the treatment of persons addicted to the morphine habit, the same as it was before."

The testimony of John Conley, deceased's brother, does not show that the deceased took morphine for pain, or that he did not go to Detroit and Eloise to get cured of the morphine habit. In fact, there is no testimony from which it can be legitimately inferred that during this period, from 1900 to 1906, deceased was in a condition where morphine was necessary to, or would, prolong his life. He was not in a critical condition, requiring " temporary relief " from morphine, certainly not where its habitual and regular use was required to prolong his life. It was, therefore, error to leave this question to the jury.

Counsel for defendant also urged that the deceased was not a member in good standing at the time of his decease, having been suspended and his appeal not having been prosecuted by the plaintiff or deceased's representative; and, again, that plaintiff's failure to appeal from the rejection of her claim precluded her from prosecuting it in a court of law, she not having exhausted her remedy in the tribunals of the order as required by the by-laws (see by-law 201, hereinbefore quoted); and, further, that under the by-laws the decision of the order was final in this State. These propositions are supported by many cases in this State. *Van Poucke* v. *Netherland St. Vincent De Paul Society,* 63 Mich. 378 (29 N. W. 863); *Canfield* v. *Knights of Maccabees,* 87 Mich. 626 (49 N. W. 875, 13 L. R. A. 625, 24 Am. St. Rep. 186); *Hembeau* v. *Knights of Maccabees,* 101 Mich. 161 (59 N. W.

417, 49 L. R. A. 592, 45 Am. St. Rep. 400); *Fillmore* v. *Knights of Maccabees*, 103 Mich. 437, 109 Mich. 13 (61 N. W. 785, 66 N. W. 675); *Rose* v. *Supreme Court, Order of Patricians*, 126 Mich. 577 (85 N. W. 1073); *Hoag* v. *International Congress*, 134 Mich. 88 (95 N. W. 996); *Derry* v. *Great Hive, L. O. T. M. M.*, 135 Mich. 494 (98 N. W. 23); *Harris* v. *Typographical Union*, 144 Mich. 422 (108 N. W. 362).

It is obvious, also, that the court erred in denying the motion for a new trial; the verdict on the one point submitted being against the testimony in the case. Other points discussed by appellee's counsel need not be further referred to, as they cannot affect the result.

The judgment is reversed, and a new trial ordered.

GRANT, MONTGOMERY, OSTRANDER, and MOORE, JJ., concurred.